Good morning, Your Honors. I'm Randy Baker for the appellant and plaintiff, Fiyen Lessor. The district court in this case granted the defendant's summary judgment motion citing three grounds. The court stated that Ms. Lessor failed to state a prime offense case of employment discrimination, that alternatively she failed to show that the defendant's justification for her termination was pretextual, and third, that her direct evidence of discrimination was immaterial. The district court was mistaken on each of these points. Ms. Lessor showed a prime offense case of discrimination by showing that she's Vietnamese, that she was terminated, that her productivity, which is the metric by which her employer both terminated hairstylists with insufficient productivity and promoted them based on high productivity, that her productivity was better than two Caucasian stylists who were not terminated. Now the reason the district court found that this was not a prime offense case of discrimination was not that it disputed any of the propositions I've just uttered or that there was evidence to support them. Rather, what the district court held was that there was no other hairstylist with as many complaints as Ms. Lessor, who was not terminated. Now there were two problems with the court's reasoning on that point. One is factual, one is legal. I'll address the legal one first. The legal problem with that is, as this court stated in the Arrogant v. I think it was Republic Disposal case, in order to state a prime offense case, the plaintiff is not obligated to rebut the defendant's justification for the decision. That happens, but that's a later stage of the McDonnell-Douglas proof scenario. So at this stage, the Arrogant court held, and I believe that's now the law of this circuit, that so long as the plaintiff recites that they're a member of a protected class and shows it, that they've suffered an adverse employment action, that the quality of their work was satisfactory, and that a person who is not a member of that protected class did not suffer the adverse action, the prime offense case is stated. The case is just a little more complicated by this one fact. As you talk about it, I'd like to go back to the case of Ms. Lesser's termination. The defendant was fired because, strictly because of the complaints. The reason I understand she got fired was that she refused to accept a performance plan, right? Well, Your Honor's correct. Is that right? Well, the defendant stated in the conjunctive, so Your Honor's correct, that the immediate temporal precipitating cause of Ms. Lesser's termination was she refused discipline. The discipline, however, according to the defendant, and... Well, it wasn't really discipline, as I understand. It was a performance plan. They had some complaints. And are the complaints disputed, by the way? Absolutely. There were no complaints? What's disputed is what... So the documents called complaints are called complaints and re-dos in the language of the defendant. So re-dos, as opposed to complaints, refer to occasions on which a customer comes back and asks for a re-do. The defendant admitted a re-do could be because the client changed their mind. And in fact, what counsel did at the deposition of Ms. Bates, the supervisor of Ms. Lesser, who stated and identified that she had an excessive number of complaints, counsel went through each of those alleged complaints with her. And as it turned out, one of them did not concern Ms. Lesser, but rather another employee. In several cases, Ms. Bates stated she couldn't ascertain whether or not the so-called complaint actually referred to improper conduct by Ms. Lesser, or rather a change of preference by the customer. One case, a person apparently was burned by chemicals. Ms. Bates was asked, well, was this caused by Ms. Lesser? Again, the supervisor was unable to answer. She said it could have been, but sometimes people are sensitive to chemicals and I can't tell what caused it in this case. Two of the cases, she said, I don't know if those are complaints that I really considered against Ms. Lesser. Subsequently, in her affidavit, she said they were, but that's an inconsistent statement, so we can't credit it on summary judgment. One of the cases... But there were complaints, there were some re-dos, and isn't an employer, I mean, this is what they were doing and saying, look, here's how you can improve your performance. Isn't an employer entitled to, if they have an employee that they perceive is having difficulties, to say, we're going to put you on an improvement plan? And an employee says, no, I don't want to do it. Isn't that a separate, independent basis for discipline? I mean, it would be fine either way. But they said, look, what we're going to do is we're not cutting your salary, we're not furloughing you, and what we're doing is we're trying to get you to improve what we perceive to be performance problems. Well, Your Honor... Isn't an employee have some responsibility to say, okay, you know, I'll cooperate with this and see if whatever the complaints are can be improved? Absolutely, Your Honor, except the employee does have that right if that's the employer's opinion. But in fact, in this case, there's evidence that's not the employer's opinion. In this case, there's evidence that, and I use the word discipline for a specific reason, this improvement plan denied Ms. Lesser access to new clients. It was conceded by defense counsel at summary judgment, at oral argument, that by denying her new clients, it threatened her productivity levels. If you don't maintain minimum productivity levels at this store, you can be terminated. Ms. Lesser feared termination because she feared this would push her productivity levels down. Now, the reason we believe that there's evidence in the record showing that this was not a good faith, I mean, that's really what an employment discrimination case is about, is the bona fides of the defendant. So, yes, if it's true that they, you know, perhaps mistakenly thought Ms. Lesser had more complaints, fine. However, we have evidence to causing one to believe that that's not what they thought. For one thing, the defendant did not regularly record, did not regularly store complaints. So when Ms. Bates signed an affidavit stating that Ms. Lesser had the most complaints, in fact, she had no way of I discovered complaints. That's not really a meaningful statement unless you discovered them in a situation in which you had reason to believe you actually knew the number of complaints lodged. But it's quite different to say they don't have a record of these things than to say this was in bad faith. You know, lots of employers don't keep track of every complaint, and yet you get a certain sense that, you know, this one employee is having more problems than others. And, you know, if you sort of asked to prove it out, you might not be able to remember everything, you might not be able to keep track of everything, but you know darn well that this is somebody you don't go to if you have a difficult problem because they're likely to flub it. So, I mean, the fact that you are able to say, oh, look, I don't remember what this was about, or it doesn't really prove bad faith. It may just prove they're mistaken. Well, Your Honor, there's several things that If they're mistaken, then they're Absolutely, it's not race discrimination if they're mistaken. But the way race discrimination is shown, among other things, is by showing the professed reason is unworthy of credence. So, as we move more and more down the spectrum from something that's obviously true to something that's extremely dubious and implausible, then we move more and more towards the point of having a justifiable inference that discrimination is involved. So, it's one thing to say, yeah, you know, our system wasn't that good. Complaints were lodged, a few went by the wayside. It's quite another to not deny Ms. Alanese, a client for the plaintiff, stated there was no system for recording or storing complaints. Were complaints taken into determining productivity, or whether a stylist was entitled to a Your Honor, the record does not indicate that complaints played a role in productivity. The record simply shows productivity. It actually doesn't show how it's computed. It's based on dollars per hour. Ms. Lester, in fact, has shown that she received a productivity-based promotion approximately two years prior to her termination. But otherwise, I don't believe there's anything Promotion to senior stylist or whatever it was, was that just based on productivity? That's right. And in fact, Ms. Lester's affidavit alleges that the promotion was supposed to be automatic based on her productivity level, and that her supervisor, Ms. Bates, refused to put it through until she insisted over and over that the promotion be made. But I'd just like to add a few more points. Was there any policy about how they would respond to complaints against a stylist? No, Your Honor. If you get two complaints, we're going to sit down, or you're going to have to take some training. If you get three complaints or four complaints. No, Your Honor. You're subject to termination. In fact, we cited the case of Gordon v. United Air, which is kind of similar in that case. The plaintiff was terminated for missing a flight. And one of the reasons the court found the missing a flight offense to be perhaps protectual in warranting a full trial was the fact there was no history. There was no rule regarding what happens when you miss a flight. There was no history of discipline for it, except in the case of one Caucasian flight attendant who was not terminated, who received a reprimand, I believe. Similarly, in this case, there's no reason to believe this is an indicator whatsoever of performance. I mean, intuitively it makes sense one would be concerned about complaints, but in fact there's no written rule. During her deposition, the supervisor was unable to even explain, as I just mentioned, whether most of these documents in fact were complaints. And then I'd like to go back to another case I cited. I think it was the Fourth Circuit, Burns v. AAF. That was a case in which the plaintiff complained of discrimination based on age. She was terminated, and the justification for the termination was she had 16 incidents of incompetent work. And it turned out that she was able to show that at least in 14 of the cases, there was reason to doubt whether in fact there was any incompetence involved. And so what the court in that case said was, well, you know, it's possible that the defendant just would have terminated her based on these two, but it's also possible that the fact that most of these alleged acts of incompetence were untrue is evidence that it was pretextual that they really terminated her because of her age. Precisely in this case. You have 30 minutes left, if you want to say anything about the time. I do. I would just like to add a couple points. Other reasons to believe there's discrimination involved, in fact, is that the supervisor in this case told Ms. Lesser in response to her question, why do you not like me, the answer was because you're Vietnamese, you don't understand clients and you make mistakes. Isn't that sort of in the record like kind of sketchy itself, when she finally remembers that? Is that something she initially talks about? Well, she spoke about it in her deposition and in her affidavit. The defense counsel said that it was inconsistent and it could not be credited. The trial court, in fact, found that it was not inconsistent, at least not sufficiently inconsistent, that the statement should not be credited as something that, in fact, Ms. Lesser remembered. What the district court said was this doesn't count as direct evidence because Ms. Bates did not terminate Ms. Lesser, it was her superior. However, the record is unequivocal both in the statements, the affidavits of Ms. Bates and in the affidavit of Mr. Bowman who terminated Ms. Lesser that he considered and relied on the reports of incompetence from Ms. Bates in terminating Ms. Lesser. The only other points I want to make are there is a profound record of discrimination against non-Caucasians by this supervisor and against Ms. Lesser in particular, including and most importantly, steering clients away from them, including clients who asked for Ms. Lesser to non-Caucasians. There is reason to believe that Ms. Bates did not like her because she was not Caucasian. And I will reserve the rest of my time. Thank you. May it please the Court, my name is Gregory Bair. I'm an employee for JCPenney. I'm also representing JCPenney as its attorney. This case is about, and these are the undisputed material facts that the district court relied on in granting summary judgment to JCPenney, it's about a store manager who decided to terminate a store employee after receiving multiple customer complaints, complaints from customers who were very angry at the service they received from one of his employees, a salon stylist, and then after trying to address that situation by putting her on a performance plan, the employer refused to accept that plan. She said, no, I'm not going to do it. And at that point, the store manager decided that that response warranted termination because it showed that she was unwilling to improve and disinterested or uninterested in customer service. Didn't the performance plan itself put her on track to be fired anyway? No, it didn't. And in fact, there's no evidence to support that. All we have is speculation, speculation from the appellant that had she gone on the performance plan, her productivity would have fallen and she would have been terminated. Now, that's what she believed, but there's no evidence to support that. Did the plan relieve her of the need to meet the performance requirements? Unfortunately, it never went that far because the plan was very preliminary when it was presented to her. And the plan, what it said was she needs to receive additional training, training referring to client consultation, product selection, geared toward the types of problems she was having in the salon. And there was a condition of the plan that until she receives this additional training, she would not be able to receive new walk-in clients. She could still continue to serve the clients, the clientele she had built up over the several years she had worked for JCPenney, but she couldn't receive new clients. And the reason for that was she seemed to be having difficulty communicating with particularly new clients. But once she received this training, she would be able to again continue to serve new clients. Did the complaints themselves say it was a new client, therefore that's why she couldn't communicate with them? The complaints talked about, I believe both of these complaints were from new clients. The complaints talked about their inability to communicate with her. They felt like she wasn't listening to them, that she just wasn't doing what they wanted her to do. And essentially what triggered this whole thing was some very upset customers and a store manager wanting to address those. There's no evidence that that store manager, none whatsoever, that that store manager was motivated by racial animus. There's no evidence that the direct manager wanted the employee to be fired. In fact, Ms. Lessor was meeting the productivity standards, was a productive associate. But there is evidence of racial animus or ethnic animus on the direct supervisor's part. She says, I don't like you because you're Vietnamese. Let me address that specifically because I know Mr. Baker raised that in his oral argument. The evidence you're referring to were handwritten notes that were found in a music notebook of the plaintiff appellant's daughter. She claims that she didn't remember this, and that's why it never showed up in an EOC complaint. It was not in her federal court complaint. It was not in her responses to interrogatories. And the notebook was never produced as a response to a request for production. She says that she happened, by happenstance, extremely serendipitous, she happened to come across this notebook the morning of her deposition. And this is what made her remember this conversation. Now, if you look at the conversation itself, and we are arguing that it should be inadmissible as an inappropriate instance of recorded recollection, and it's inadmissible because under But it doesn't matter. She now says that she remembers it as a fresh recollection, and she now says she remembers the conversation. So I would posit that it's not possible for a recorded recollection, something you've forgotten and then remembered, to suddenly be an independent recollection. Otherwise, there would be no need for the recorded recollection. Why do we have a rule of evidence that deals with a fresh recollection? I remember from law school. As I said, if you show the witness a banana and it's a fresh recollection, you can show them anything. And, in fact, common experience shows that sometimes she sees something and it brings back a memory. But she's now relying on her, or she claims to be relying on her recollection. And if you, you sound skeptical, and maybe you should be, but isn't that the kind of thing that has to be sorted out at trial? I don't believe so because our You don't want to accept it as true for purposes of a judgment. Our position is that summary judgment evidence must be admissible and competent in order to raise a material issue of fact, and that this recorded statement, this hearsay statement, is not admissible and competent. It's not the recorded statement. She is saying, I now remember. So, you know, the piece of paper, whatever the thing is in the jar of her memory, is now being proffered. What's being proffered is her testimony. What's admissible about that? Well, assuming for the purposes of this argument that it is admissible, I think if you look at the statement itself in context, it's not direct evidence of racial discrimination. And the statement is set out in full on page 41 of our brief, of the respondent's brief. What she wrote in the notebook, and what she claims now is the basis for her recollection, is the following. I asked her why other stylists got complained. They still have walk-in. Why not me? She said walk-in belonged to salon. She give to whoever she like. I asked her, why you don't like me? And she said, because you are Vietnamese, because you can't understand client well. That's why clients complain. So if you put it in context, it's a discussion apparently that happened during the time this performance plan was being proposed. And she's asking her, well, other stylists are getting walk-in clients. Why can't I get walk-in clients? And the response she gets is according to what was written here. Because you are Vietnamese, because you can't understand the clients well, that's why clients complain. What it seems to be is an explanation for why she's having trouble with client communications in the salon. It's not direct evidence. She's not saying, I want to fire you because you're Vietnamese, and I don't like you because you're Vietnamese. What she's saying is, you seem to be having trouble because clients can't understand you. That's a pretty good jury argument. I mean, I think a jury might buy it, but why can't a jury just as easily say, she said, she had a question, why don't you like me? The answer is, because you're Vietnamese. Then she adds some other stuff, which may be in addition to, may be an explanation to, but that's what lawyers are there to argue to the jury. But she, in direct answer to the question, why don't you like me? She says, the first thing she says is, because you're Vietnamese. I don't know. So, I mean, what if she said black or Jewish or Hispanic? You know, if you fill in whatever that, would there be any difference? Well, the other thing that's important to keep in mind, the reason that the way the district court dealt with the situation was they said, even if this conversation happened, even if it is admissible, and assuming it's admissible, it's not material because it doesn't change the outcome of the case. The decision maker here was the store manager.  Well, that's very thin ice, because we have lots of law that says, if an immediate supervisor for racially discriminatory motives or for discriminatory, illegally discriminatory motives starts a chain of events that leads to discipline, that pains the process, even though the person above may not be biased or may not be even aware of the animus. The Supreme Court did give us some guidance in the recent case of Staub v. Proctor Hospital. It's been much discussed, and I apologize, I'm not aware whether the Ninth Circuit has applied this in some cases, but assuming most practitioners believe that it would. Staub v. Proctor Hospital talks about the cat's paw theory, the situation that Judge Kuczynski was referring to. If you have a direct supervisor who causes one of his or her direct reports to be terminated, even though the direct supervisor may not have been the decision maker, how do we analyze those claims? Staub set out some requirements for claims like that. What it said was that a couple of things you must show. You have to show that the direct supervisor's actions were the proximate cause of the termination, and you also have to show that the direct supervisor intended for termination to be the result. They intended the ultimate employment action to be the result. And we don't have that situation here. If anything, the proximate cause of the situation, the thing that precipitated it was the client complaints themselves, and then the employee's reaction when she's presented with this performance plan, that no, I'm just not going to do it. But the performance plan itself is what the problem here in the case as far as the claim is concerned, right? The performance plan is one that means I'm going to be terminated because I can't make any money. I can't keep my productivity. But there's no evidence of that. And in fact, supervisors all the time do relax the productivity requirements. So that could have been done. There was nothing in the plan that provided for that, correct? No, and the plan was not committed to writing. It was preliminary. It was given to her orally twice. She refused it both times, and that's not disputed. But this oral presentation of the plan is made by the person who she claims has animus toward her. It was made, I believe it was made both by the direct supervisor and by the store manager in two different instances. And in both instances she said, no, I'm not going to do it. She refused to. She refused to acknowledge that she had a problem. She said, it's not me, it's the customers. The same response that she's had on appeal. She hasn't, and I think Judge Kuczynski is right to point out, she hasn't ever disputed that there were customer complaints. And it is also important to note that the number of customer complaints is not what's material here. Whether it was 10 or 12 or 13, the outcome would have been the same. The number of customer complaints. You say that you had more complaints than anybody else, so the number is important, isn't it? Well, it's important in looking at, has plaintiff produced evidence that she was treated differently from other employees in the salon? Defense has maintained throughout that the number of complaints she received in the five months before she was fired were greater than any other person in the salon. And we produced hundreds of documents from which the plaintiff or the appellant could have done her own analysis and said, well, what about employee A, employee B, employee C? They also had a high number or a greater number or a similar number of complaints. She never did that. There's also in the record that some other complaints came about later on that weren't disclosed by your client until some sort of anonymous disturbance or something. The way that it happened was that, and to be clear, she was not terminated because she had more complaints. They didn't do an analysis of the 27 stylists working in the salon. She had the number one complaints and they fired her. That's not why she was fired. She was clearly fired because there were complaints, including very upset customers. A performance plan was provided and she refused to accept it. That's why she was fired. During the course of the EEOC investigation and this lawsuit, documents were produced showing how many complaints there were. And we produced all the records we had. At one point, it appears that someone at the salon, and plaintiff appellant doesn't know who it is, respondent doesn't know who it is, someone at the salon took documents, either copied them or sent the documents anonymously through the mail to the plaintiff appellant, documenting other complaints. Plaintiff appellant has said that there were some among these that were not among the documents produced by J.C. Penney, but some were among the documents produced by J.C. Penney. This occurred prior to the lawsuit ever being filed. So if there were documents that were taken out of the salon and sent to plaintiff, we wouldn't have had them then to subsequently produce. But in any event, if you assume that all of those documents were sent to plaintiff, then she had, in addition to all the documents J.C. Penney produced, she had these documents, but at no time did she go through them and say, there were five other employees, there were two other employees, there was even one other employee who had the same amount of complaints who wasn't dealt the same way. And perhaps more importantly, they've never pointed to any employee who was presented with a performance plan but refused to accept the plan and was not terminated. That would be the ultimate similarly situated employee. You've got two employees, they're both presented with the same fact pattern and they're treated differently because of it. So in questioning whether or not this is a disparate treatment case, whether someone was treated differently based on race, that's when we would look at the number of complaints. And it's plaintiff's burden throughout to explain that, to demonstrate that she had a similar number of complaints, and she's not done that. But the appellant has asserted that these facts, the facts before you are so extremely dubious and implausible that they create an inference, a tribal issue of material fact that creates an inference of discrimination. On the record, it just doesn't exist. There's a clear narrative here, there's a clear story of why she was terminated. She was terminated because there were upset customers, her manager tried to deal with that situation, and in response she said, no, I'm not going to do it. And essentially she was fired for insubordination. Thank you. Thank you, Your Honor. You have about a minute and a half left. Thank you. Under Chang V. University of California Davis, the defendant's supervisor saying, I don't like you because you're Vietnamese, that's enough. Summary judgment is survived. What do you make of Staub? What I make of Staub is that it supports us because both Mr. Bates, Mr. Bowman who fired her, and Ms. Bates agree that he considered her reports of excessive complaints in deciding that she needed to be put on a performance plan. Now, Counsel is saying, well, she wasn't fired because she had more complaints, she was fired because she was insubordinate. Well, let's remove the complaints and impose the discipline because it denied her new customers. Okay. If there's no excessive complaints, Ms. Lesser is refusing to accept discipline imposed on her for what reason? Because she's Vietnamese? Doesn't work. Thangosin, the Seventh Circuit case we cited, had a very similar set of issues. In that case, in fact, the person was ethnically Asian. He was demoted allegedly because he didn't do well on an exam. He retook the exam. And on a portion of the exam when he retook it, which he did not contend to be racially biased, his score went down. So he would have failed anyhow. And the court and the defendant said, well, so it wasn't race because he did poorly on this portion of the exam. And what the Seventh Circuit said, well, the man alleged he was having to take this thing a second time in the first place because he's Asian. So the fact he admitted that he lost interest and enthusiasm and went down cannot be used as a justification for terminating him. Okay. Thank you. Thank you. Agents, you will stand submitted. We'll next hear argument on the last case on the calendar. Billingham Insurance Agency v. Arkeson.
judges: Collins, Kozinski, Paez